This decision of the New Mexico Court of Appeals was not selected for publication in the New Mexico Appellate Reports. Refer to Rule 12-405 NMRA for restrictions on the citation of unpublished decisions. Electronic decisions may contain computer-generated errors or other deviations from the official version filed by the Court of Appeals.

## IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

No. A-1-CA-40656

**STATE OF NEW MEXICO,**

Plaintiff-Appellant,

v.

**UVALDO AVILA,**

Defendant-Appellee.

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY**
**Lucy Solimon, District Judge**

Hector H. Balderas, Attorney General
Santa Fe, NM
Emily Bowen, Assistant Attorney General
Albuquerque, NM

for Appellant

Bennett J. Baur, Chief Public Defender
Santa Fe, NM

for Appellee

## MEMORANDUM OPINION

**HANISEE, Chief Judge.**

**{1}** This matter was submitted to the Court on the brief in chief pursuant to the Administrative Order for Appeals in Criminal Cases from the Second, Eleventh, and Twelfth Judicial District Courts in *In re Pilot Project for Criminal Appeals*, No. 2022-002, effective November 1, 2022. Having considered the brief in chief, concluded the briefing submitted to this Court provides no possibility for reversal, and determined that this case is appropriate for resolution on Track 1 as defined in that order, we affirm for the following reasons.

**{2}**     The State appeals an order suppressing evidence, arguing both that Defendant's seizure was supported by the public servant doctrine and, in the alternative, that the evidence suppressed was admissible pursuant to the attenuation doctrine. [BIC 6-13, 23-29] In asserting that the conduct of the arresting officer in this case was justified by the public servant doctrine, the State relies upon the fact that a car Defendant was driving "was associated with a missing person report." [BIC 2] The State also relies upon the arresting officer's testimony that he initially approached Defendant, not because he suspected criminal activity, but solely "to ascertain the nature of the circumstances" surrounding the car and the missing person report. [BIC 8]

**{3}**     We note, however, that the district court found that this testimony was contradicted by a video recording of the officer's encounter with Defendant, that the officer's actions were not consistent with his professed motives, and that the officer's testimony lacked credibility. [RP 102, 105, 121] This Court is in no position to assess credibility determinations made below. *See State v. Evans*, 2009-NMSC-027, ¶ 37, 146 N.M. 319, 210 P.3d 216 (noting that an appellate court is "unable to view the witness's demeanor or . . . manner of speech, and therefore [is] not in a position to evaluate many of the aspects of witness credibility that the trier of fact may evaluate"); *see State v. Yazzie*, 2019-NMSC-008, ¶ 14, 437 P.3d 182 (noting that where "video evidence conflicts with other evidence, an appellate court must defer to the district court's factual findings if supported by evidence in the record"). As a result, we do not substitute our judgment for that of the district court or reweigh its credibility determinations. *State v. Salas*, 1999-NMCA-099, ¶ 13, 127 N.M. 686, 986 P.2d 482 (explaining that this court defers "to the district court when it weighs the credibility of witnesses and resolves conflicts in witness testimony").

**{4}**     Because the district court's findings regarding witness credibility in this case are beyond the scope of this Court's review, we turn to the State's arguments that other evidence supported application of the public servant doctrine. In particular, the State asserts that the district court erred because "the missing person report was, in and of itself, sufficient to support a brief seizure." [BIC 1] In support of that assertion, the State directs our attention to out-of-state authority relying upon the existence of missing person reports to find that police officers were engaged in community caretaking rather than investigating crime. [BIC 9-10]

**{5}**     It seems self-evident that community caretaking is a broad enough concept to encompass efforts to locate missing persons. Nonetheless, we are not persuaded that an officer's knowledge that an unidentified person has been reported as missing will, as a matter of law and without more, justify privacy intrusions pursuant to the public servant doctrine. Instead, our cases have consistently held that the public servant doctrine applies to cases in which the actions of law enforcement are motivated by a concern for public safety rather than investigating crime. *See Schuster v. N.M. Dep't of Tax'n & Revenue*, 2012-NMSC-025, ¶ 27, 283 P.3d 288 (stating that action by "an officer in his or her role as a community caretaker is reasonable as long as the officer is motivated by a desire to offer assistance and not investigate"); *State v. Sheehan*, 2015-NMCA-021, ¶ 13, 344 P.3d 1064 (same). Thus, we are not persuaded that the

existence of a missing person report, "in and of itself," was sufficient to bring the officer's conduct in this case within the public servant doctrine, and an examination of that officer's actions remains necessary. [BIC 1]

{6}     Turning to whether those actions were motivated by a concern for public safety, the State suggests that the district court improperly relied upon the officer's failure to read the missing person report before approaching Defendant. [BIC 10-11] The State suggests that the district court unreasonably disregarded the officer's reasonable explanation that "it is difficult and unsafe for him to read while driving." [Id.] The district court's findings on this point note that the officer testified he stopped Defendant because he had been driving a vehicle associated with a missing person report. [RP 111] Those findings, which are not challenged in this appeal, also acknowledge the officer's testimony that he did not scroll down to learn the identity of the missing person because he was driving at the time. [Id.] He did, however, call for backup and wait for the arrival of a second officer while Defendant was inside a gas station. [Id.] Finally, the district court found that the officer could have read the missing person report while waiting for backup to arrive and for Defendant to come out of the gas station, but did not do so. [RP 112] Although the State emphasizes the difficulty of reading a missing person report while driving, nothing in its brief challenges the district court's actual finding that the officer could have read that report while parked and waiting for backup.

{7}     Perhaps conceding that the officer could have learned the identity of the missing person before approaching Defendant, the State next argues:

> Even in if [the officer] had found the name of the missing person in the report, he still would not have known the name of the individual walking toward the vehicle because he had not yet made contact with that person. Accordingly, the information gleaned from a thorough reading of the report still would not have aided him absent a conversation with Defendant himself.

[BIC 11] We have no doubt that a police officer looking for a missing person might have talked to Defendant as part of that search, but the question in this case was not whether a hypothetical officer looking for a missing person would have talked to Defendant. The question being addressed by the district court was whether or not this specific officer was looking for a missing person when he approached Defendant.

{8}     The fact that the officer in question did not know the name of the reportedly missing person—nor any other identifying characteristics that might have helped him find a missing person—suggests that the officer was engaged in some other endeavor. Indeed, given that officer's complete ignorance of anything having to do with the missing person report except that a car Defendant had driven was "associated" with that report in some unspecified way, it is unclear how knowing something like "the name of the individual walking toward the vehicle" would have helped to locate any missing person. [BIC 11]

**{9}** Ultimately, the district court concluded that, having "failed to take reasonable steps to ensure his detention of Defendant was justified under the community caretaker doctrine," the officer had "detained Defendant on nothing more than a vague notion that Defendant might be involved in foul play rather than based on a specific and articulable safety concern." [RP 171-72] On appeal, the State is largely asserting that its evidence can be viewed as supporting a contrary finding that the officer was, in fact, engaged in community caretaking pursuant to the public servant doctrine. This Court, however, "must indulge in all reasonable inferences in support of the district court's decision and disregard all inferences or evidence to the contrary." *State v. Martinez*, 2018-NMSC-007, ¶ 15, 410 P.3d 186 (text only). Given that standard of review, we conclude that the State has not established reversible error with regard to the district court's factual finding that "the officer's initial contact was primarily motivated not by a concern for the safety of a missing person but by a desire to investigate possible criminal activity." [RP 113]

**{10}** The State also asserts that the district court improperly relied on a fact relevant to the emergency aid doctrine instead of the public servant doctrine when it found that the officer had no reason to believe that "any person was in danger such that the officer's assistance was required." [BIC 10] The order on appeal, however, notes that the State asserted below "that the public servant doctrine applies but the encounter can also be justified under the emergency aid doctrine." [RP 107] It thus appears the district court was addressing more than just the public servant doctrine in its analysis. Further, because we affirm the district court's findings regarding the illegality of Defendant's seizure, we need not address the State's arguments on appeal that subsequent events led the officer to develop both reasonable suspicion for an investigatory detention and articulable suspicions capable of justifying a protective search. [BIC 13-19] Facts allowing the expansion of a stop beyond its original scope would not cure the initial illegality of the stop in this case.

**{11}** However, the State also argues, in the alternative, that the suppressed evidence in this case was admissible pursuant to the attenuation doctrine, which allows evidence that might otherwise be suppressed on the basis of a constitutional violation to be admitted if it "has been purged of the taint of the original illegality." *State v. Tapia*, 2018-NMSC-017, ¶ 15, 414 P.3d 332. The factors relevant to whether the taint of illegality has been dissipated are: "(1) the lapsed time between the illegality and the acquisition of the evidence, (2) the presence of intervening circumstances, and (3) the purpose and flagrancy of the official misconduct." *State v. Edwards*, 2019-NMCA-070, ¶ 9, 452 P.3d 413 (internal quotation marks and citation omitted).

**{12}** On appeal, the State concedes that "the first factor weighs in favor of suppression" [BIC 24], but asserts "the district court misapplied the second and third factors to the facts of this case" [BIC 29]. Because the district court agreed with the State that the arrest warrant was a sufficient intervening circumstance to support attenuation (the second factor) [RP 120], we understand the State to actually be challenging only the district court's finding of purposeful and flagrant official misconduct (the third factor).

**{13}** In assessing that third factor of attenuation, courts consider whether: "(1) the impropriety was obvious, or the official knew his conduct was likely unconstitutional but continued nonetheless; or (2) the misconduct was investigatory in design and purpose." *State v. Monafo*, 2016-NMCA-092, ¶ 15, 384 P.3d 134. In this case, the district court made findings that the officer's "conduct demonstrated the true purpose of the stop was an arbitrary fishing expedition" and concluded that the "misconduct was investigatory in design and purpose." [RP 121]

**{14}** In so finding, the district court relied upon the fact that the officer "failed to familiarize himself with the contents of the [missing person] report before making contact," and asserted in the video that Defendant's car "came back as stolen." [Id. 105] The district court also relied on the video evidence to find that the officer neither inquired about Defendant's well-being in any way nor did "so much as look into [Defendant's car] to see if someone other than Defendant might need assistance." [RP 110]

**{15}** On appeal, the State asserts that the rapidly evolving circumstances did not permit the officer to inquire about Defendant's well-being, and that "there was no evidence that the officer's inaccurate statement [about the car being stolen] was anything more than a slip of the tongue." [BIC 26] In sum, the State is asserting that "the facts supporting the court's finding of flagrant misconduct were adequately explained by the officer's testimony and a review of the body camera footage." [BIC 27] We again note that the testimony at issue was explicitly found incredible by the district court, and decline to second-guess that determination. *See Salas*, 1999-NMCA-099, ¶ 13 (declining to reweigh "the credibility of witnesses"). We further note that the district court appears to have considered the entire circumstances surrounding Defendant's seizure, and not relied upon any particular fact in isolation. As such, that court does not appear to have put undue weight on the fact that Defendant was not asked if he needed help, but instead appears to have noted that fact in the larger context of police actions that do not appear to have been directed toward assessing anyone's well-being. To the extent that the officer claimed to be engaged in community caretaking because a car was "associated" with a missing person, we agree with the district court that the officer's failure to even briefly ascertain whether there was anyone in the car is relevant, and made more relevant if, as the district court found, that was part of a larger pattern of apparent disinterest in providing assistance to anyone in need.

**{16}** We, similarly, decline the State's invitation to speculate regarding whether or not the officer's incorrect statement about a stolen car was a "slip of the tongue," and instead defer to the district court's assessment of the evidence. Viewing that evidence in the light most favorable to the decision reached below, and indulging all reasonable inferences in favor of the district court's findings, as we must, we conclude that the district court's findings regarding the officer's purpose and intent are supported by substantial evidence in the record, justifying that court's conclusion that admission of the evidence at issue in this case "would embolden police to engage in unreasonable seizures under the guise of community caretaking." [RP 122] Accordingly, we conclude that the district court properly determined that the purposeful and flagrant misconduct

associated with Defendant's seizure weighed in favor of granting Defendant's motion to suppress evidence.

**{17}** Based on the foregoing, we affirm the order of the district court suppressing evidence obtained as the result of Defendant's unlawful seizure.

**{18}    IT IS SO ORDERED.**

**J. MILES HANISEE, Chief Judge**

**WE CONCUR:**

**JACQUELINE R. MEDINA, Judge**

**SHAMMARA H. HENDERSON, Judge**